## KATES *v.* ATLANTA BAGGAGE & CAB COMPANY.

1.  In its character as a common carrier and relatively to duties and obligations arising therefrom, a railway company can not grant to any person, or persons, rights or privileges which it refuses to others, but must treat all alike.

2.  Such a company, in the management and control of its property and as to matters involving no duty to the public, may grant concessions to some

which it denies to others; especially so when the grant is made in pursuance of a reasonable and proper regulation which in effect operates beneficially to its patrons.

3. Relatively to passengers and their baggage, the duty of a railway company, in its capacity as a common carrier, begins with affording to them, and to all of them alike, proper and suitable facilities for entering depots to purchase tickets and take passage, and for checking baggage, and ends with affording to them like facilities for leaving such depots and obtaining their baggage on presenting the checks therefor. The rights which the law in these respects secures to passengers may be exercised by them either in person or through their chosen agents.

4. If a railway company in good faith complies with the law as above laid down, it does not violate any public duty or deprive any citizen of any lawful right by granting to a single corporation or individual the exclusive right of entering its trains to solicit the transportation of passengers and baggage, or by renting to such corporation or individual a portion of its baggage-room and conceding to it or him the privileges necessarily incident to the occupancy and use thereof, provided that so doing does not interfere with the exercise by any other person of any right which he may lawfully demand of the company as a common carrier.

5. As to the facts involved, the evidence was conflicting, and it does not appear that the judge abused his discretion in finding as to them in favor of the defendant in error, or in denying the injunction.

Argued March 27, 28, — Decided July 21, 1899.

Petition for injunction. Before Judge Lumpkin. Fulton superior court. November 19, 1898.

*Rosser & Carter* and *Thomas L. Bishop*, for plaintiff.

*Hoke Smith & H. C. Peeples, Joseph B. & Bryan Cumming, Sanders McDaniel, Payne & Tye, Erwin & Brown, Vasser Woolley, Dorsey, Brewster & Howell* and *Arthur Heyman*, contra.

LITTLE, J. The facts necessary for a clear comprehension of the merits of the petition, under which the defendants were sought to be enjoined, may be briefly stated as follows: The union passenger-depot in the city of Atlanta is owned jointly by the State and three railroad companies. By agreement, all the railroad-trains which reach the city of Atlanta enter and depart from this passenger-station. The control of this building has been placed in the hands of a board of control, who represent its owners. Connected with the station is a baggage-room, jointly used by all of the railroad companies. The petition filed in this case alleges that the board of control has made a contract with the Atlanta Baggage & Cab Company, by which

the latter is given the exclusive privilege of entering the depot building for the purpose of handling trunks and baggage and of issuing what is known as claim-checks, that is to say, that company is allowed to deliver, at his home or elsewhere, to a prospective passenger its check for his trunk, and on delivery of a trunk so checked, at the baggage-room, it is received by the baggage-master and held until the check is presented. It is further alleged that by other terms of said contract the Atlanta Baggage & Cab Company is given the exclusive privilege of having its agents to board the passenger-cars of the different railway-lines which enter the city, before the union passenger-station is reached, for the purpose of soliciting business and making contracts with passengers for the delivery of baggage after the same reaches the city. Also, that the board of control permits the cab company to have an office in the baggage-room of the passenger-station, and the agents of such company are allowed access to the passenger-station to solicit patronage for the delivery of baggage; that it is allowed storage in the baggage-room for the baggage of its customers, hours in advance of the departure of outgoing trains, and transacts its business in the baggage-room; that said company is also permitted to use railroad-checks by which it is enabled to furnish to its customers, at their homes, railroad checks for baggage to the points of destination. It is further alleged that the baggage-master in charge of the baggage-room is a stockholder and officer in the Atlanta Baggage & Cab Company. The petitioner, Kates, further avers, that he has been engaged in the baggage-delivery and express business for a number of years in the city of Atlanta, and is a competitor with the Atlanta Baggage & Cab Company for the transportation of the baggage of the passengers to and from the union passenger-station, and that his charges for the same are much less than those for similar services performed by the Atlanta Baggage & Cab Company; that under the contract between the board of control and the Atlanta Baggage & Cab Company he is excluded from entering the baggage-room or passenger-station in the conduct of his business, and is denied the privilege of having an office for the transaction of his business in the passenger-station, and is

not only refused permission to enter the baggage-room, but he is compelled to wait until all trunks handled by the Atlanta Baggage & Cab Company are taken out before he can obtain possession of the baggage of his customers; that the officers in the baggage-room manifest a spirit of vindictiveness towards him, are discourteous, and by improper treatment they are attempting to drive him out of the business in order to secure a monopoly of the baggage business in the city of Atlanta; that none of the privileges granted to the cab company are allowed to the plaintiff, but all are refused to him; that by reason of the privileges so granted, the cab company has been enabled to have a monopoly of business in the city, and that such monopoly has been enjoyed at the expense of the traveling public. It is alleged that these privileges are unreasonably allowed the cab company, that they work great hardship on the plaintiff, and his business has been and is now greatly injured thereby, and he ought to be allowed like privileges with his competitor. The prayers of the petition are, that the contracts existing between the defendants and the railroad companies through the board of control be declared illegal and void; that the railroad companies and the board be enjoined from discriminating against the petitioner in the manner set out in the petition; and that the defendants be enjoined from allowing the cab company any of the advantages and privileges set out in the petition, and from allowing them any privileges which they refuse to petitioner.

The defendants answered, admitting that a contract existed with the Atlanta Baggage and Cab Company, but averring that no exclusive privilege of entering the depot for the purpose of hauling trunks, baggage, etc., has been given to the cab company; that the railroads entering the passenger-station have a common baggage-master who has exclusive charge of all baggage delivered at the passenger-station; that the cab company has nothing to do with the baggage which arrives at the station until such baggage has been delivered to it; that the same rights which are accorded to the cab company as to the receipt and delivery of baggage are extended to all companies and persons engaged in the business, including petitioner; that

the petitioner as well as the cab company is permitted by the board of control to give claim-checks to its patrons, which the baggage-master recognizes. They deny that the regulation is either unjust or illegal, but aver that such an arrangement is obliged to be made in order to serve the traveling public with dispatch and economy. The answer admits that the agents of the cab company have been granted the exclusive privilege of boarding passenger-trains coming into the city and soliciting patronage for baggage on such trains, and that they are likewise allowed full access to the passenger-station for the purpose of soliciting baggage. The nature of this business requires that it should be exclusive. It denies that the cab company has free access to the baggage-room, and admits that the plaintiff is excluded from entering the baggage-room or depot of the defendants to transact his business. It admits that the cab company is allowed to have an office in the baggage-room, and that petitioner has been refused an office in the depot-station, but denies the charge that he has been compelled to wait until all trunks handled by the cab company have been taken out. It avers that the baggage is delivered promptly and in the order in which the same is called for, and that no partiality or preference has been shown either in the receipt or delivery of baggage at the station. It also denies that any illegal privileges have been granted to the cab company, or that any injustice or unfairness is done petitioner. It admits that the baggage-master is a stockholder in the cab company, but avers that he has nothing whatever to do with the business of that company, and also denies any discrimination against the petitioner by the baggage-master. It is further averred that it is absolutely necessary, in order to accommodate the public, to have an arrangement to care for the baggage of passengers, and that to accommodate the traveling public as to the delivery of its baggage it is necessary to have some one to meet incoming trains and furnish such passengers as desire them receipts for their baggage. Defendants therefore furnished the cab company with an office; the passenger-station is small, the railroads are crowded for room, and it would be impossible to furnish petitioner or any other company a room in the

building in which they could carry on its business; the right to occupy an office in its depot and the right to send agents on its trains are the only exclusive rights and privileges granted to the cab company. In all other particulars the petitioner has every privilege and right that the cab company has; and while the privileges given to the latter company are exclusive in their character, they are essentially necessary to the proper discharge of the business of the defendants as carriers. It denies that petitioner has ever been hindered in his business by them, and avers that the servants of the defendants have been instructed to deliver baggage to the plaintiff as quickly as possible; and while the plaintiff is not allowed to solicit baggage on the trains or inside the car-shed, he has every access to the station for the presentation of both checks and baggage. It admits that the cab company is allowed to check trunks from residences to points of destination, after inspection of the passenger's ticket. The pleadings are voluminous, and contain many other allegations and averments.

On the hearing the evidence for the petitioner tended to show the facts alleged to be true in the petition. That of the defendant tended to rebut all the particular facts which were not admitted by the answer. As a part of his evidence, the petitioner introduced a contract executed November 25, 1891, by the board of control and the Ballard Transfer Company, by which it was provided that the latter company should have the exclusive control of checking baggage from all parts of the city of Atlanta into and from the baggage-room of the depot; that the transfer company should be allowed an office for the conduct of its business in the baggage-room at the station, to be fitted up at the expense of the transfer company; that the railroad companies should employ their own baggage-master and help for handling baggage between the room and the trains, and the transfer company should handle baggage from the room to all points in the city, and deliver baggage from points in the city to the baggage-room; that the transfer company should be allowed the privilege of sending agents free of charge on such trains as it would select for the purpose of soliciting the carriage of baggage to points in the city before the arrival of

trains. . The transfer company on its part agreed to furnish first-class baggage service and pay to the railroad companies the sum of three hundred dollars for the privileges enumerated. It was also agreed that the transfer company should execute and deliver a bond in the sum of five thousand dollars, payable to the railroad companies, for the faithful performance of the terms of the contract. Another contract of similar character, to which the Atlanta Baggage & Cab Company and the board of control were parties, was also in evidence. Its stipulations were practically the same, and continued with the cab company the stipulations made with the Ballard company, with the additional stipulations that the agents of the cab company should conduct their business in an orderly and respectful manner and under the authority of the conductors of the several trains; that the agents should not act as agent for hotels, restaurants, or business, nor distribute any form of advertising matter, nor be engaged in any other business than that designated, etc. The above statement is sufficiently full to make clear the points in issue. The court denied the injunction, and the plaintiff excepted.

The evidence was in direct conflict on many points. As to the truth of the allegations about which the evidence is conflicting, it is, so far as we are concerned, settled by the determination of the judge, and the right of the petitioner to have the judgment refusing the injunction reversed must depend on the application of legal principles to such of the allegations as are not contested by evidence, and these are: First, that the defendants permit the cab company to enter the passenger-trains before reaching the city, for the purpose of soliciting baggage, and refuse the same privilege to the petitioner. Second, that the servants of the cab company are allowed access to the passenger-station for the purpose of soliciting patronage and for more conveniently attending to its business, and this privilege is refused to petitioner. Third, that the privilege of using an office in the baggage-room of the defendants for the transaction of its business is granted to the cab company and refused to Kates. Fourth, the privilege of checking the baggage of prospective passengers at hotels and residences in advance

of delivery of the baggage at the passenger-station; each of which privileges is refused to petitioner. It can not successfully be maintained that the grant of these privileges to the cab company is in violation of law, nor do the concessions of themselves create a monopoly, nor are they in any sense an interference with the right of the traveling public. On the contrary, it will be recognized that the exercise of the facilities named tends to the public convenience and the prompt and safe handling of the baggage of the passenger. Under no view of the case would the petitioner be entitled to the aid of the courts in restricting these conveniences and lessening the facilities for the safe and convenient handling of the effects of a passenger. The law would hardly undertake to declare that a railroad company should not, if it so desired, through its representative deliver to one at his home in the city of Atlanta a check insuring the delivery of his trunk in the city of New York for which he was bound, and subject the passenger to the inconvenience of personally appearing at the baggage-room, pointing out his trunk, and there receiving the railroad company's check. We know of no obligation which requires that a railroad company shall furnish such a facility, but certainly there can be no reason to forbid its doing so, if it will; and likewise the privilege afforded to an incoming passenger before arrival to deliver to a responsible person the check for his baggage, with an obligation on the part of the latter to deliver the same at the residence or hotel of the passenger, infringes nobody's rights, but does promote the convenience of the traveling public; and rather than forbid, the law's administrators will encourage such a facility. It is not the right of the plaintiff in error, by injunction or otherwise, to take away or disturb any reasonable means tending to promote the convenience and comfort of the public. The merit of his complaint, if any exists, must be found in the fact of the refusal of the defendants to grant to him the opportunities so to serve the public and thereby better his business. Whether the refusal so to do is proper or unlawful does not depend upon the favor or inclination of the railroad company, but upon the plaintiff's right. If it should depend upon favor, then the plaintiff in error has

**no** cause of complaint, because favor is essentially free and voluntary, and may not be demanded; and it is in this view that we come to measure by the legal standard what are the rights of the petitioner under the allegations he makes, as against the rights of the defendants to control property to which they have title and consequently the right of use, and the plaintiff in error, to succeed, must establish the proposition that the defendants as common carriers are in law bound to afford to him the same conveniences and facilities for carrying on his business which they afford to others engaged in the same calling.

It is claimed that the grant of the enumerated privileges to the cab company, and the refusal of them to petitioner, is the exercise of an undue preference on the part of the carrier against the business of petitioner, and that such grant and refusal establishes a monopoly which is forbidden by law. In entering into the consideration of these important questions, we find that the field of enquiry has been frequently traversed, with the result of adjudicated cases not entirely in harmony. In some of these, the decisions are based on the common law; in very many more, on the terms of various statutes; and it may be well to enquire whether our own organic or statute law deals particularly with such questions. It is undeniably true that the whole spirit of our constitution and laws is directed against any restriction of competition. Constitution of Ga., art. 4, section 2, par. 4. Section 2214 of the Civil Code declares against discrimination in rates of freight and in the furnishing of facilities for interchange of freights, etc., as do also sections 2188, 2307, 2268, and 2274 of the Civil Code, in a greater or less degree. While it is perhaps true that there are no express rules of any of our statutes which enact penalties for unjust discrimination exercised by carriers to the detriment of the business of another, yet the scope and intent of the provisions to which we have referred are broad enough to afford a remedy. But in the absence of any statutory declaration, we are remitted to the principles of the common law to determine whether the refusal to grant the plaintiff in error the exercise of the facilities afforded to another in the same business is an unjust discrimination, or an unequal and illegal prefer-

ence.   The defendant railroad companies are common carriers
and are under obligation to serve the public equally and justly.
Having accepted their right of existence from the public, they
owe a duty to the public, and their conduct must be equal and
just to all.   The very definition of a common carrier excludes
the right to grant monopolies or to give special or unequal
preferences.   It implies indifference as to whom he may serve
and an equal readiness to serve all who may apply in the order
of their application.   57 Me. 188.   From these characteristics,
which apply to all common carriers, it is a sound legal prin-
ciple that a railway company as a common carrier can not
grant to any person or persons, or to any part of the public,
rights or privileges which it refuses to others, but must treat
all alike.   Receiving and discharging baggage is one of the
duties of a public passenger-carrier, and the obligations before
enumerated apply in full force in the receipt and discharge of
baggage at the union passenger-station in the city of Atlanta;
and if it should be found to be true that the defendant railroad
companies, either in the receipt or delivery of baggage by their
baggage-master or other agents, discriminated against any pas-
senger or the agent of any passenger in the time or manner in
which baggage was received or discharged either through a
system of claim-checks or otherwise, such discrimination would
be a palpable violation of their public duties; for which the
law affords ample remedy by injunction and full redress in
the nature of damages.   So of injury to or undue interference
with the baggage presented.   Neither should discourteous lan-
guage or personal ill-treatment by the agents of the carrier in
the performance of his business be tolerated.   As these charges
were denied, and the judgment sought to be reversed necessa-
rily included a finding against their truth, nothing more than
a recognition of the principle need now be adverted to; but,
inseparably connected with the transaction of its public busi-
ness, a common carrier is invested with the ownership of
property, for the safe and efficient exercise of the franchises
which the public has for its own benefit given to it.   Railroad
companies have rights of way, stations, depots, cars, engines,
etc., as their equipment to serve the public.   In the use of

such property as public carriers, no one of the public ought to be favored more than another, nor is it lawful to impose any restriction, or make any discrimination in such use, against any one, which does not apply to all; but this rule of impartiality applies to railroad companies in their public capacity, and it by no means follows that such reasonable rules and regulations which a carrier may make for the protection of its property, for the safety and convenience of its passengers or freights, are subject to the same unqualified condition.

This court in the case of *Fluker* v. *Georgia R. R. Co.*, 81 *Ga.* 461, recognized the distinction which exists between the duty which a railroad company owes to the public and the private right to regulate and control its property. In that case the railroad company had leased to one individual the right of serving lunches to passengers on its trains at a given place. Another claimed the right to exercise the same privilege, which the company denied, and the claimant was expelled as an intruder. As in our opinion this case goes very far in determining the legal questions now presented, we freely refer to the opinion rendered by Chief Justice Bleckley as sound in principle, and authority binding upon us. Through him the court says: "It is contended that the company has no such exclusive dominion over the tracks and spaces embraced in its right of way as to entitle it to exclude therefrom any person entering thereon in an orderly manner and upon lawful business; and especially that it can not discriminate against one person and in favor of another. We have discovered no authority for this position, either in its more limited or more extended form. On the contrary, it would seem that the very nature of property involves a right to exclusive dominion over it in the owner. We can not believe that there is a sort of right of common lodged in the public at large to enter upon lands on which railroads are located, and over which they have secured the right of way. Such lands the railroad companies may inclose by fences if they choose to do so, and exclude any and all persons whomsoever. Their dominion over the same is no less complete or exclusive than that which every owner has over his property. If they do not choose to erect fences and make

enclosures, they may, by mere orders, keep off intruders, and they may treat as intruders all who come to transact their own business with passengers or with persons other than the companies themselves. . . The business of selling lunches to passengers, or of soliciting from them orders for the same, is not one which every citizen has the right to engage in upon the tracks and premises of a railway company, and consequently those who do engage in it and carry it on must depend upon the company for the privilege." Citing 67 N. Y. 301 ; 31 Ark. 50 ; 2 Gray, 577 ; 88 Penn. St. 424 ; 128 Mass. 5 ; 29 Ohio St. 364. This is the exposition of the law in force in this State, from which, as we believe, there has been no departure. If the principles declared are applicable to the facts of the present record, it would seem that the contention of the plaintiff that he should be allowed, as a matter of right, access to the depot-grounds and trains of the defendant railroad companies to ply his business, must fail. The case clearly rules the principle that a railroad company has the right to exclude from its premises persons going thereon for the purpose of transacting private business ; and a second proposition is equally as clearly stated to be, that the privilege of doing so may be granted to one and refused to another without violating any principle of law which governs the conduct of carriers and regulates their duty to the public. Counsel for plaintiff in error, however, has cited the case of *Western Union Telegraph Co.* v. *American Union Telegraph Co.,* 65 *Ga.* 160, as authority for the proposition that exclusive privileges can not be granted to one person or corporation for the conduct of its business by a railroad company. The case referred to, however, does not, in our opinion, serve as authority which would render the contract between the railroad companies and the cab company illegal, nor compel the companies to grant the same privileges to the plaintiff in error. In the case cited, the American Telegraph Company sought to enjoin the Western Union Telegraph Company from interfering with it in erecting its telegraph-lines on the right of way of the several railroads mentioned in the bill. The Western Union Co. insisted that, under contract with the railroads named, it had the exclusive right to use the right

of way of the railroads for the erection of a telegraph-line. The court held that the contract was made to prevent competition, that that class of contracts were not favored by the law, were against public policy, tended to create monopolies, and were in general restraint of trade. That decision is sound, and the principle decided does not conflict with anything ruled in the *Fluker* case. The two telegraph companies were incorporated to subserve the public convenience and to promote the business of the public. When the American company, owing duties to the public and having the right to condemn property for the use of its fixtures for the purpose of itself serving the public, sought to exercise that right, the grant of an exclusive privilege was urged as a bar to the right of condemnation. All of these corporations had the right of eminent domain. The right of way of the Western Union Telegraph Co. did not impair the right of use by the railroad company, nor would the use of any portion of another part of the right of way by the American Telegraph Co. impair the right of the Western Union Telegraph Co. to use the right of way under its contract. So that, all three of the corporations being organized for public purposes, and the right of way acquired by the exercise of eminent domain, and the use by neither affecting the efficiency of the other, it was perfectly competent for the American Telegraph Co., notwithstanding the exclusive contract, to appropriate such portion of this right of way as was necessary for its use. The exercise of the right of eminent domain is not restricted to the condemnation of the property of private individuals, but it extends also to the condemnation and use of property held by other corporations of a public character, where it can be done without detriment to the rights of use of the first taker. Lewis on Eminent Domain, § 265; *City Council of Augusta* v. *Ga. R. R. & Bkg. Co.*, 98 *Ga.* 164.

In the case at bar, it must be conceded that the union passenger-station belongs to the railroad companies and not to the public at large. It is perfectly true that the use which such ownership carries is a public use, that is to facilitate and expedite the duties which their charters and the law impose on the owners. It would then follow that no orderly person entitled

to be transported on a train leaving the station could lawfully be excluded from entering it for that purpose. But because the use by the owner is for the purposes of the public, no reason is afforded why as a matter of right an individual might occupy it to transact his private business. The plaintiff 'in error is not a corporation created for public purposes, and owes no duty to the public in any public capacity, and he could acquire against the railroad companies no right of use of their property, and such use, if any be obtained, must depend upon the favor of the owner or arise by contract. The railroad companies must have a discretion in the management of the property used by them. See Audenried v. Philadelphia & Reading R. R. Co., 68 Pa. St. 370. We are not unmindful of the fact that it has been ruled in a number of adjudicated cases that the law does not permit undue or unreasonable preferences to be given in the right to be admitted upon railroad-grounds among those who conduct themselves in an orderly manner, nor will exclusive privileges be allowed to some in plying their business which are denied to others. To sustain this proposition a number of English authorities are cited, which are based on the railway and canal traffic act of 17 and 18 Victoria, which some of the courts have held to be simply declaratory of the common law, as well as a number of American cases, among them, 8 N. H. 523; 57 Me. 188; 52 N. H. 430; 9 Mont. 419; 84 Mich. 194; 61 Vt. 241; 92 Conn. 465. It is freely conceded that some of these cases go to the extent of ruling that a railroad company can not grant to one person or corporation the privilege of plying its business on its grounds, and refuse the same privilege to other persons or corporations engaged in the same business. On the contrary, the *Fluker* case, supra, and a number of adjudications of other courts, rule otherwise. See 29 Ohio St. 364; 2 Fed. Cas. 892; 95 U. S. 485; 114 U. S. 1; 139 U. S. 80. Because of this direct authority from our own court as well as the apparent soundness of the reasoning in cases from other jurisdictions, we can not subscribe to the correctness of the rule insisted on by the plaintiff in error. Taking the allegations of the petition to be true, it would be difficult to point out any public duty which the

,railroad companies owed to the plaintiff in error. In the very nature of things it would be impossible for a railroad company to permit the agents of all baggage or express companies to enter its trains to solicit the transportation of baggage, and yet, because of such impossibility, it would hardly be fair to the traveling public to refuse to permit the agent of any to do so. In the case of Jencks v. Coleman, 13 Fed. Cases, 443, it was held that the admission of one of such agents to the exclusion of others, if reasonable and in good faith, was legal. That the railroad companies allowed one of the transportation companies to fit up an office in its baggage-room, and to ply its business from there, certainly worked no detriment to the convenience of the public. It is impracticable that all persons. doing such business should have an office in the building, but that they can not affords no reason why one should not be permitted to do so, and, while promoting its own business, subserve at the same time the public convenience. Certainly the traveling public is benefited by a facility which enables trunks to be checked at hotels and residences. These checks become tokens. of a contract between the railroad company and the prospective passenger for the transportation of the baggage of the latter. The person delivering such checks is in law and in fact the agent of the railroad company, and we know of no provision of law which restrains a common carrier from delivering checks for baggage at hotels, residences, or elsewhere. Certainly the carrier must have the right to select his own agents, and instruments for the execution of his contracts. We are thus led to the conclusion that, under the facts admitted to be true in the case at bar, the plaintiff in error was not entitled to the injunction for which he prayed, and that the court committed no error in refusing to grant the injunction.

*Judgment affirmed. All the Justices concurring.*